MoKjNNey, J.,
delivered tbe opinion of tbe court.
■ This is a bill filed on behalf of tbe State, by tbe Attorney General of tbe sixth judicial circuit, under tbe act of 1840, ch. 139, to recover from tbe administrator of Thomas Crutcher, deceased, formerly Treasurer of tbe middle division of tbe State, about tbe sum of six thousand dollars, on account of various sums of money, received by the intestate, as Treasurer, and not accounted for in any of bis settlements. The several items composing said sum, are specifically set forth in tbe bill, and are alledged to have been received between tbe years of 1829, and 1835. Tbe bill is based upon a statement made out by the Comptroller of the treasury. *507 on tbe 19th of January, 1849, pursuant to tbe act of 1840, showing that tbe errors and omissions charged in tbe bill are evidenced “by entries in tbe treasurer’s books, and on executions and receipts,” in tbe band-writing of tbe said Thomas Crutcher.
Tbe intestate was Treasurer for tbe period of twenty years, and up to tbe 1st of March, 1886. Settlements appear to have been made with him, from time to time, by committees of tbe Legislature. Tbe last settlement of bis accounts was made after bis retirement from office, by tbe Comptroller of tbe Treasury, according to tbe provisions of act of 1835, cb. 27, § 13.
Tbe answer of tbe defendant does not admit any of tbe ex’rors or omissions charged in the bill; relies upon tbe settlement of tbe intestate’s .official accounts; and also relies upon tbe general statute of limitations, and tbe statutes passed for tbe benefit and protection of tbe estates of deceased persons, in bar of tbe relief sought by tbe bill.
Tbe intestate died in tbe early part of 1844, and this bill was filed on tbe 11th day of September, 1851; more than seven yea/rs after bis death,' and gi’ant of administration upon bis estate.
Tbe chancellor, on tbe bearing of tbe cause, ordered an account; from which ordex*, by leave of tbe court, an appeal was prosecuted to this court. The decree of tbe chancellor assumes, and tbe argument here, in support of it, maintains, that time does not run against tbe State; because, as is argued in none of our statutes of limitation, is tbe State expressly, or by necessary implication, included.
Tbe contrary of this position is asserted by tbe defendant’s counsel, who insist, that by tbe act of 1840, under *508 which, this bill was filed, suits brought by .the State, are, in all respects, placed upon precisely the same footing as those of individual persons, as to the forms of procedure, the rules of evidence, and principles of law, applicable to the case, under the general law of the land.
Ve have been referred by the counsel representing the State, to several American cases, which maintain the doctrine, that the policy of the common law rule, which excepts the crown from the operation of' statutes of limitation, applies with equal force to our system of government. Some of the cases seem to proceed upon the ground, that this principle of the common law was brought with them by our ancestors from England, and incorporated into our .jurisprudence; and the reason of this is said to be found in the public policy of securing the public rights and revenues, from injury and loss by the negligence or fraud of public officers. In England, this principle results from the prerogative, or “that special pre-eminence which the king hath, above all other persons, and out of the ordinary course of the common law, in right of his regal dignity; ” 1 Bl. Com., 239. The law ascribes to the king, not only the attribute of sovereignty, but of “absolute perfection,” also. Hence, as no laches, or negligence, can be imputed, “the king has a prerogative, quod nullwn tempus oc&wrrit regi, and therefore the general acts of limitation do not extend to him; ” 11 Co., 68-14, b. The law intends that the king is always busied for the public good, and therefore has no leisure to assert his right within the time limited to his subjects; 1 Bl. Com., 248.
The American cases referred to, concede, that this principle, so far as it relates to the person and regal *509 dignity of the king, can have no application in this country; but that, so far as it is founded upon, and is subservient to tbe policy of protecting the public against the negligence and fraud of its agents, it is alike applicable here as in England.
If it were • important, in the decision of the present case, to enter into a discussion of this subject, it might, perhaps, be doubted, whether this maxim of regal prerogative, was not one of the very things which our ancestors, instead of bringing with them, were most careful to leave behind, as not altogether consistent with the theory of government and jurisprudence maintained, and desired to be adopted by them. And it might no less admit of doubt, whether the notion of public policy, upon which the principle is held applicable in this country, is not based upon an unsound and false theory; the practical tendency of which, would be to discourage, rather than to secure, the' prompt and faithful discharge of official- duty in public functionaries. But in the case under consideration, it is not necessary to enquire, whether or not the State is within the operation of the general statutes of limitation; and we leave that question open for adjudication, when a decision shall become necessary. We will confine ourselves to the question, for the present, whether or not the statutes, limiting the period within which suits may be brought against the representatives, real, or personal, of deceased persons, form a bar to the present suit. And in considering this question, it may be admitted, that statutes, general in their terms, should be regarded as meant only to regulate the rights, and prescribe a rule of conduct for the citizens. In the language of Mr. Justice Story, “where the government is not expressly, or by *510 necessary implication, included, it ought to be clear, from the nature of the mischief to be redressed, or- the language used, that the government itself was in contemplation of the legislature, before a court of law would be authorized to put such an interpretation upon the statute ; ” United States vs. Hoar, 2 Mason’s Rep., 311-314.
"We proceed then, in the first place, to consider the act of 1840, under the provisions of which this bill was filed. The sixth section enacts, “That the State of Tennessee shall be, and is hereby authorized to commence and prosecute suits for all causes of action accrued or accruing to the State, in all of the courts of the State, according to the lems of the land, as m other cases.”
That this statute intended to place the State upon the same footing with other suitors in the courts, can admit of no doubt; it is so, in effect, declared in terms. If this be not so, then the words have no meaning. The claim of right, or “ cause of action,” sought to be enforced, must be of such a character as, “ according to the laws of the land,” may be enforced “ in other cases.” The remedy and the right of the State, on the one hand, are to be regulated and determined according to the law of the land, as in other cases, between individual suitors; and so, on the other hand, precisely the same rule is to govern, as respects the matters of defence of which the defendant may avail himself. Whatever matter would be a valid defence according to the settled principles of law and modes of procedure, in like cases between individuals, will be equally so in suits instituted on behalf of the State, under the act of 1840. The express declaration, that the suits, which the statute authorized to be brought by the State, shall be prosecuted “according to the laws of the land, as in other cases,” is comprehcn- *511 sive of every thing respecting either the right or the remedy; and it clearly excludes the idea of an intention, that the State, as a suitor in the courts, should be permitted to claim or assert anything in the nature of prerogative or exemption, out of the ordinary course of the law of the land, not admissible in similar controversies between private individual suitors.
In this view of the act of 1840, it results, that the present action is barred by the statutes of limitation before referred to; more especially by the act of 1115, ch. 48, § 9. This conclusion is not only greatly strengthened, by looking to the language and object of the act of 1715, but we think the same conclusion must be arrived at, upon a proper construction of the latter act, by its own proper force and meaning, aside from the act of 1840.
The ninth section of that act declares that, “the creditors of any person deceased shall make their claim within seven years after the death of such debtor, otherwise such creditors shall be forever barred.”
This statute in its character, object, and effect, is wholly different from the ordinary statutes of limitation. The term “creditors,” it may be remarked, properly includes artificial persons, as bodies politic or corporate, as much as natural persons; and a remarkable feature of the law is, that it contains no exception or sawing clause, - in favor of the rights of any person whatever. It must therefore, upon the established principle of construction, applicable to statutes of' limitation, be taken to run against all persons, and artificial persons, as well as natural. It is a general principle of law, that no laches, or negligence,, can be- *512 imputed to a person wbo is within the age of twenty-one years; and, therefore, in ordinary statutes of limitation, which are designed only to act upon the remedy, there is a saving of the rights of wifcmts, femes covert, persons non compos, &c. But it is well settled, that a statute of limitation runs against, and bars the rights of all persons not expressly mentioned and excepted in the statute. Persons not expressly excepted, cannot be exempted by construction; and therefore infants and other persons laboring under disabilities, are embraced by the general words of a statute, if there be no saving clause in their favor; Angelí on Lira., ch. 7; 17 Ves., 86.
Now, would it not be most unreasonable, not to say absurd, in the construction of this statute, which, under the general denomination of “ creditors,” comprehends the State as much as individual citizens, to hold that infants and others who, in law, are deemed positively incapable of understanding or protecting their rights, should be barred; and yet, that the State, or rather its agents and functionaries, should be held exempt from the operation of the bar? Might it not, with reference to this statute, be safely affirmed, that, by necessary implication, the State is included? This is still more conclusively demonstrated, by looking to the reason and object of the law, and its difference, in other respects, from ordinary statutes of limitation. This statute establishes what is called a positive prescription, or limitation, in contradistinction to a negative prescription. The distinction between them is, that the former acts upon, and extinguishes the right, the latter only affects the remedy. Positive prescription has the effect of putting a final end to all further litigation or controversy; and *513 is a means of acquiring a positive right to property, after the lapse of such period as the law has fixed upon, as sufficient for that purpose.
But a statute of limitation, in the nature of a negative prescription, applies not to the right, but merely to the remedy. The debt is not extinguished, nor the right destroyed, as in the former case; and hence, upon the express promise or admission of the debtor, the payment of the debt may be afterwards enforced; Angl. on Lim., ch. 1.
This statute is founded upon just and urgent considerations of public policy. The discouragement of litigation, under circumstances which, in many cases, preclude the attainment of truth or justice; the suppression of frauds and perjuries, in attempts to set up demands against the estates of deceased persons, when the means of exposing their falsity have perished; the necessity that those who succeed to the rights and property of such deceased persons, should be quieted in the enjoyment of their rights* These, and other reasons which might be stated, strongly sustain the policy of the Act of ÍYIS. The period fixed is sufficiently long for all creditors, in the exercise of reasonable diligence, to assert their rights; and they have no just ground of complaint that, after the expiration of the time limited, their rights are declared to be taken away and extinguished; the loss is the consequence of their own laches. Does not the policy of the statute apply as much to the State, as the creditor of a deceased person’s estate, as to individual creditors? And would it not be in opposition to the soundest public policy, to exempt the State from the operation of this statute, thereby giving a license to negligence on the part of government officers entrusted with the supervision and *514 settlement of the official accounts of those whose duty it is to collect and account for the public revenues?
The same reasoning applies, with perhaps equal force, to the Act of 1Y89, ch. 23, § 4; limiting the periods for bringing suits against the executors or administrators of the estates of deceased persons. The idea that the State is not bound by these statutes, is startling, when we consider the consequences in reference to the administration of insolvent estates under our system; and scarcely less so, as respects solvent estates, after the property of the estate has been disposed of in the payment of debts, or has passed into the hands of innocent purchasers. Against whom, in such case, would the State pursue her remedy, if it existed ? But it is unnecessary, upon this point, to say more. Although the right of sureties, in the official bopds of government agents, to be discharged in reasonable time from all liability, and other considerations that might be stated, tend to strengthen the conclusion, that, “from the nature of the mischiefs to be redressed, as well as from the language used, the government itself was in contemplation of the legislature,” in the enactment of these laws...
There is another ground upon which the State is precluded from maintaining this bill. Thomas Crutcher went out of office on the 1st of March, 1836, nearly sixteen years before this bill was filed; and all the various errors and omissions set forth in the bill, are charged to have occurred prior to that date.
The Comptroller of the treasury, who, in 1836, made a final settlement with said Crutcher, after his retirement from office, pursuant to the act of 1835, ch. 2Y, § 13, in his report to the succeeding legislature, says, “ The balances .which were ascertained to be due from *515 former treasurers, respectí/oély, for monies received and not 'previously accounted for, were 'promptly adjusted.”
> This was the official act of tbe highest accounting officer of the government; it received the approval of the legislature; and the State, under the circumstances of this case, is concluded by it. That the State is bound by the acts of its public agents, was held by this court in case of the State vs. Jefferson Turnpike Company, 3 Humph., 305, and again in the State vs. Hamilton, 11 Humph., 47-49.
It follows, that the decree of the chancellor is erroneous, and it is reversed and the bill dismissed.
TotteN, J., dissented, upon the point, that the State is barred by the acts of 1115 and 1189, holding the contrary opinion.